UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| MONTLAKE COMMUNITY CLUB, *et al.*, | CASE NO. C17-1780-JCC |
| Plaintiffs, | ORDER |
| v. | |
| DANIEL M. MATHIS, *et al.*, | |
| Defendants. | |

This matter comes before the Court on Plaintiffs' motion for summary judgment (Dkt. No. 53) and motion for voluntary dismissal pursuant to Federal Rule of Civil Procedure 41 (Dkt. No. 64), and Defendants' cross-motions for summary judgment (Dkt. Nos. 46, 52). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES Plaintiffs' motion for summary judgment (Dkt. No. 53), GRANTS Plaintiffs' motion for voluntary dismissal (Dkt. No. 64), and GRANTS Defendants' cross-motions for summary judgment (Dkt. Nos. 46, 52) for the reasons explained herein.

## I.  BACKGROUND

This lawsuit arises out of the "SR 520, I-5 to Medina: Bridge Replacement and HOV Project" (the "Project"), a multi-decade highway improvement project intended to expand capacity on the State Route 520 bridge in King County, Washington, and make other related infrastructure improvements to the bridge and adjoining highway. (*See* Dkt. Nos. 43 at 15, 34-1

at 106–08); *see also Coalition for a Sustainable 520 v. The United States Department of Transportation, et al.*, 881 F. Supp. 2d 1243, 1247–54 (W.D. Wash. 2012) (describing the Project's preferred design alternative). Plaintiffs allege that Defendants failed to adequately consider the environmental impacts that would arise from the planned closure and demolition of a grocery store, the Montlake Market (the "Market"), as necessitated by various Project refinements and construction activities. (Dkt. Nos. 33-1 at 11, 43 at 2.) The Market is located adjacent to the State Route 520 interchange with Montlake Boulevard (the "Montlake Interchange Area"). (Dkt. Nos. 1 at 11; 33-13 at 16, 177–78.)

Plaintiff Montlake Community Club is a nonprofit organization dedicated to maintaining and improving the quality of life within Seattle's Montlake neighborhood. (Dkt. No. 43 at 5.) Plaintiff BTF Enterprises, Inc. ("BTF") is an owner of the Market. (*Id.*)[1] Defendant Daniel M. Mathis is named in his official capacity as Division Administrator for the Washington Division of Defendant the Federal Highway Administration ("FHWA"). (*Id.* at 6.) Roger Millar is named in his official capacity as Washington Secretary of Transportation, in which capacity he is charged with overseeing and approving Defendant the Washington State Department of Transportation ("WSDOT") projects throughout Washington State. (*Id.*)

In June 2011, the FHWA and WSDOT published the final environmental impact

_____

[1] This lawsuit also includes Plaintiffs Montlake, LLC and Stelter Montlake, LLC, (collectively, the "Owner Plaintiffs") who own the real property on which the Market is located and lease the land and building to BTF and other businesses. (Dkt. No. 43 at 5.) After briefing was closed on the parties' cross-motions for summary judgment, Plaintiffs filed a motion for voluntary dismissal of the Owner Plaintiffs pursuant to Federal Rule of Civil Procedure 41. (Dkt. No. 64.) Plaintiffs state that the Owner Plaintiffs have reached a settlement agreement with the State of Washington in which, among other things, they agreed to withdraw from this lawsuit. (*Id.* at 2.) The parties have since filed a stipulation outlining the terms of the Owner Plaintiffs' voluntary dismissal. (Dkt. No. 70.) Finding good cause, the Court GRANTS Plaintiffs' motion for voluntary dismissal (Dkt. No. 64). Plaintiffs Montlake, LLC and Stelter Montlake, LLC's claims are hereby DISMISSED with prejudice and the Owner Plaintiffs and Defendants shall bear their own attorney fees and costs. To the extent the other terms of the parties' stipulation (Dkt. No. 70) are relevant to the resolution of this lawsuit, the Court ADOPTS those provisions in this order.

statement ("FEIS") for the Project, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C). (*Id*. at 15.) The preferred alternative design reviewed in the FEIS did not consider the closure and demolition of the Market. (*Id*. at 15–16; *see* Dkt. No. 33-1 at 11.) In August 2011, the FHWA signed the Record of Decision ("ROD") explaining its basis for choosing the preferred alternative design and summarizing mitigation measures that would be incorporated into the Project. (Dkt. Nos. 43 at 11, 33-15 at 89); 23 C.F.R. § 771.127(a). The ROD also contained a copy of the Programmatic Agreement that Defendants entered with various stakeholders as required by the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101-320303. (Dkt. Nos. 43 at 17, 34-1 at 132.) The Programmatic Agreement identified mitigation measures that could be utilized during completion of the Project in order to minimize the impacts on historic properties including the Montlake Historic District, adjacent to where the Market is located.[2] (Dkt. No. 33-15 at 218–19.)

In July 2012, a lawsuit alleging that the FEIS and ROD violated NEPA was rejected by another court in this district. *See Coalition for a Sustainable 520*, 881 F. Supp. 2d at 1259. Since then, the Project has moved forward significantly, but also undergone several design changes and refinements. (*See, e.g.*, Dkt. No. 33-1 at 9) (listing environmental reevaluations completed in response to design changes). In October 2016, the FHWA approved a reevaluation of the FEIS (the "2016 Reevaluation") to assess the environmental impacts related to various design changes. (Dkt. No. 33-13 at 171–87.) The 2016 Reevaluation considered, among other things, how certain design changes to the Montlake Interchange Area would require condemning the parcel of property where the Market and the adjacent Montlake 76 Gas Station (the "76 Gas Station") are located. (*Id*. at 178.) Regarding these changes, the 2016 Reevaluation stated that:

> The property would be used to build some of the project's planned improvements, such as retaining walls and fill, sidewalks, connections to shared-use trails, and utility relocations and modifications. The property may also be used for

---

[2] Plaintiff Montlake Community Club is a concurring party to the Programmatic Agreement. (*See* Dkt. No. 33-15 at 251.)

construction staging, traffic shifts, and transit access during construction. The Montlake 76 Service Station would be decommissioned and demolished as part of construction activities.

(*Id*.) While the 2016 Reevaluation expressly anticipated the closure and demolition of the 76 Gas Station, it did not state that the Market would be closed or demolished. (*Id*.) After analyzing the environmental impacts that these proposed design refinements would have—including on traffic, noise, and adjacent cultural resources such as the Montlake Historic District—the 2016 Reevaluation concluded that "no new significant adverse effects, beyond those described in the [FEIS] and ROD, would result from the changed conditions." (*Id*. at 181, 178–190.)

Plaintiffs filed this lawsuit on November 28, 2017. (Dkt. No. 1.) In their original complaint, Plaintiffs alleged that Defendants had changed the scope of the Project such that the Market would have to be condemned and destroyed. (*Id*. at 13–14.) Plaintiffs asserted that Defendants had violated NEPA by failing to consider the environmental impacts associated with the closure and demolition of the Market. (*Id*. at 15.) Specifically, Plaintiffs alleged that the 2016 Reevaluation had not adequately considered the impacts that closure of the Market would have on traffic and on travel times "for Montlake residents who routinely use [the Market]." (*Id*. at 13.)

In July 2018, Defendants approved an environmental reevaluation (the "2018 Reevaluation") that evaluated the environmental impacts associated with the closure and demolition of the Market. (*See* Dkt. No. 33-1 at 9–10.) The 2018 Reevaluation sought to evaluate "how the proposal for the closure and demolition of the [Market] would affect the natural and built environment and whether those effects differ from the effects described in the [FEIS], [ROD], and subsequent environmental reevaluations and memoranda." (*Id*. at 9.) The 2018 Revaluation analyzed the environmental impacts on transportation, noise and vibration, and cultural resources, among others. (*Id*. at 13–16.) The 2018 Reevaluation concluded that "no new significant adverse effects, beyond those described in the [FEIS] and ROD, would result from" closure and demolition of the Market. (*Id*. at 13.) Plaintiffs filed an amended supplemental

complaint alleging various claims related to the 2018 Reevaluation. (Dkt. No. 43)

## II.    DISCUSSION

In their amended supplemental complaint, Plaintiffs allege three claims for relief. (*See* Dkt. No. 43 at 22–25.) First, Plaintiffs allege that Defendants failed to issue a supplemental environmental impact statement ("SEIS") regarding the closure and demolition of the Market as required by NEPA, and that Defendants' failure to do so was arbitrary and capricious in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. (*Id.* at 22–23.) Second, Plaintiffs allege that Defendants' failure to revise the ROD in light of the proposed closure and demolition of the Market was arbitrary and capricious in violation of the APA. (*Id.* at 24.) Third, Plaintiffs allege that Defendants violated the NHPA by failing to adequately consider, evaluate, or propose mitigation for the impacts related to closure and demolition of the Market, specifically to the Montlake Historic District. (*Id.* at 24–25.) The parties have filed cross-motions for summary judgment on all claims. (*See* Dkt. Nos. 46, 52, 53.) The parties' cross-motions for summary judgment are based on a voluminous administrative record filed with and reviewed by the Court. (*See* Dkt. Nos. 33–36.)[3]

### A.    Applicable Legal Standards

#### 1.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that no genuine dispute of material fact exists and that the Court can enter a judgment in favor of the moving party as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the initial burden to demonstrate that no

---

[3] While the administrative record is over 21,000 pages, the key documents are the FEIS (beginning at Dkt. No. 34-1 at 80), the ROD (beginning at Dkt. No. 33-15 at 89) the 2016 Reevaluation and exhibits (Dkt. No. 33-13 at 171–191), and 2018 Reevaluation and exhibits (Dkt. No. 33-1 at 9–63).

genuine dispute of material fact exists. *Celotex*, 477 U.S. at 323. If the moving party satisfies its burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). A genuine issue exists if the non-moving party presents evidence from which a reasonable factfinder, viewing the evidence in the light favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. at 263.

Summary judgment is particularly appropriate in cases involving judicial review of a final agency action. *See Occidental Engineering Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). Here, the parties agree that there are no genuine disputes of material fact and that the matter can be determined as a matter of law from the administrative record.

## 2. APA and NEPA

Under the APA, district courts may review final agency decisions made pursuant to NEPA. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). The APA allows a district court to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court applies a "narrow" standard of review and will only reverse an agency action if:

> The agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (internal quotations and citations omitted). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *See Ranchers Cattleman Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agriculture*, 499 F.3d 1108, 1115 (9th Cir. 2007) (internal quotations and citation omitted).

NEPA requires that agencies prepare an environmental impact statement ("EIS") for major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA "does not mandate particular substantive results, but instead imposes only

procedural requirements." *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir. 1994). NEPA requires an agency to take a "hard look" at the potential environmental consequences of proposed projects before taking action. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983). NEPA also imposes a continuing duty to supplement previous environmental documents. *Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1463 (9th Cir. 1984).

An agency must supplement an EIS if new information or project changes point to significant impacts not addressed or considered in the original EIS.[4] *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (if "new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.") (alteration in original); *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (an SEIS is required if a new proposal "will have a significant impact on the environment in a manner not previously evaluated and considered.") (citation omitted).

"[T]he [agency] must initially determine the significance of the impacts brought about by the proposed change in order to decide whether supplemental documentation is necessary." *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997). To make this determination, an agency may conduct an environmental reevaluation. *Id.* (citing 23 C.F.R. § 771.129(c)). Thus, whether a supplemental EIS is ultimately necessary depends on the findings and conclusions reached by the agency in its reevaluation. *Id.* So long as the agency takes the requisite "hard look" at the significance of the environmental impacts arising from the proposed change, it has met its burden under the applicable regulations. *See id.* Review of an agency's decision to not supplement an EIS is "controlled by the 'arbitrary and capricious'

---

[4] The relevant governing regulations require that an agency supplement an EIS if it determines that "[c]hanges to the proposed action would result in significant environmental impacts that were not evaluated in the EIS." 23 C.F.R. § 771.130(a)(1).

standard of § 706(2)(A)." *Marsh*, 490 U.S. at 376; *see also Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 (9th Cir. 2000) (an agency's decision "to forego an SEIS should not be set aside unless it was arbitrary or capricious.").

**B.      Standing**

Defendants challenge Plaintiff BFI's statutory standing to pursue its claims because it has "only an economic interest" in the litigation, which does not bring it within the "zone of interests" protected by NEPA. (Dkt. Nos. 46 at 13, 52 at 22.) Defendants do not, however, challenge Plaintiff Montlake Community Club's standing to bring claims under NEPA. (*See* Dkt. No. 46 at 9.) Plaintiff Montlake Community Club argues that because it has standing to bring its NEPA claims and Plaintiff BFI is alleging identical claims, the Court need not decide whether Plaintiff BFI has standing. (*See* Dkt. No. 57 at 6.) The Court agrees.

Plaintiff Montlake Community Club has alleged sufficient facts to establish that it has organizational standing to bring NEPA claims on behalf of its individual members, and Defendants have not challenged those allegations. (*See* Dkt. No. 43 at 7); *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183, (2000). Since the Court has determined that Plaintiff Montlake Community Club has organizational standing, it need not determine whether Plaintiff BFI independently has standing, because Plaintiffs are asserting identical claims in this lawsuit. *See Secretary of Interior v. California*, 464 U.S. 312, 319, n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other respondents, whose position here is identical to the State's."). Therefore, Defendants' motion for summary judgment is DENIED as to Plaintiff BFI's standing.

**C.      NEPA Claim – Supplemental Environmental Impact Statement**

Plaintiffs first claim that Defendants failed to take a hard look at the individual and cumulative environmental impacts of closing and demolishing the Market in the 2018 Reevaluation. (Dkt. No. 43 at 21) ("The July 18, 2018 re-evaluation presented a cursory evaluation of the closure and demolition of the Market on water resources, ecosystems, traffic,

land use, recreation, noise, and other potential impacts, but did not amount to the requisite 'hard look' required by NEPA.") As a result, Plaintiffs assert that Defendants' failure to complete a SEIS was arbitrary and capricious, in violation of the APA. (*Id.* at 22–23.) Specifically, Plaintiffs argue that the 2018 Reevaluation was deficient because it failed to take a hard look at the significant noise and traffic impacts that would arise from closure and demolition of the Market. (Dkt. No. 53 at 8–23.) The Court assesses each issue in turn.

### 1. Noise Impacts

Regarding noise and vibration impacts, the 2018 Reevaluation stated that removal of the Market would "meet City of Seattle noise regulations," and "would not affect the operational noise levels presented in the [2016 Reevaluation]." (Dkt. No. 33-1 at 16.) Plaintiffs assert that the 2018 Reevaluation: failed to consider new noise sources that would arise from the closure and demolition of the Market; failed to consider that the Market provided an important noise barrier that would be removed following its demolition; and that the combined impact of the new noise sources and loss of the Market as a noise barrier would severely impact residences in the Montlake Historic District. (*Id.* at 8–18.)

#### a. New Noise Sources

Plaintiffs assert that Defendants failed to consider the following noise sources that would result from the Market's closure and demolition: (1) use of the site as a construction staging area; (2) multiple reconstructions of Montlake Boulevard; (3) reconstruction of a water line that runs under State Route 520; (4) reconstruction of a sewer pipe under Montlake Boulevard; (5) loss of the 500-foot construction buffer originally contemplated in the EIS; and (6) noise from haul trucks using the Market property as a staging area. (*Id.* at 9–14.)

As an initial matter, Plaintiffs reference several noise sources that were explicitly considered in either the FEIS or the 2016 Reevaluation and thus cannot be raised in this lawsuit under the applicable statutes of limitations. A general six-year statute of limitations applies to NEPA actions brought under the APA. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1316 (9th Cir.

1988) (applying the general statute of limitations found in 28 U.S.C. § 2401(a) to NEPA action). However, a more stringent statute of limitations applies to the type of environmental reevaluations that Defendants conducted in 2016 and 2018. *See* 23 U.S.C. § 139(l). Claims seeking judicial review of an agency's analysis of environmental impacts arising from a design change to a federal highway project must be filed within 150 days of publication of the final approval in the Federal Register. *See* 23 U.S.C. § 139(l).[5]

In this case, the FEIS was issued in June 2011 and the ROD was issued in August 2011. (*See* Dkt. Nos. 33-15 at 89, 34-1 at 80.) Under the general six-year statute of limitations, any APA challenges to those documents must have been filed in June and August 2017, respectively. However, Plaintiffs did not file their complaint until November 28, 2017. (*See* Dkt. No. 1.) Notice of the 2016 Reevaluation was published in the Federal Register on December 12, 2016. 81 Fed. Reg. 89569 (December 12, 2016). As such, any challenge to the proposed design modifications or resulting environmental impacts included in that document would had to have been filed by May 11, 2017. Because Plaintiffs did not file this lawsuit until November 2017, they cannot challenge any of the design changes or resulting environmental impacts that were considered in the FEIS, ROD, or 2016 Reevaluation. Nor can they argue that the 2018 Reevaluation failed to evaluate certain environmental impacts that were explicitly raised in those earlier documents.

---

[5] The relevant provision states:

> Notwithstanding any other provision of law, a claim arising under Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency for a highway or public transportation capital project shall be barred unless it is filed within 150 days after publication of a notice in the Federal Register announcing that the permit, license, or approval is final pursuant to the law under which the agency action is taken, unless a shorter time is specified in the Federal law pursuant to which judicial review is allowed. Nothing in this subsection shall create a right to judicial review or place any limit on filing a claim that a person has violated the terms of a permit, license, or approval.

23 U.S.C. § 139(l).

Although Plaintiffs appear to acknowledge the relevant statutes of limitation, they still attempt to argue that Project changes outlined in the FEIS and 2016 Reevaluation will cause noise impacts that Defendants did not adequately consider in the 2018 Reevaluation. (*See* Dkt. No. 57 at 2) ("[W]e are not challenging the adequacy of either the EIS or the 2016 reevaluation as of the time they were produced."). For example, Plaintiffs argue that the use of the Market property as a construction staging area would cause noise that was not sufficiently considered in the 2018 Reevaluation. (Dkt. No. 53 at 9–11.) However, the 2016 Reevaluation explicitly stated that "[t]he property in which the Montlake 76 Service Station and Montlake Boulevard Market are located would need to be acquired for construction and project improvements." (Dkt. No. 33-13 at 188.) The 2016 Reevaluation also "evaluated the proposed changes to the limits of construction" and noted that changes included "[e]xpansion for the acquisition of the property in which the Montlake Market and Montlake 76 Service Station is located." (*Id.* at 189.)

While Plaintiffs argue that the 2016 Reevaluation only considered the impacts of using the 76 Gas Station's property for construction staging, the administrative record suggests otherwise. The 2016 Reevaluation did not draw a distinction between the 76 Gas Station's and the Market's property, but explained that they were part of a "larger parcel" and that "a substantial portion of the parcel is required for and to construct project improvements." (*Id.* at 178.) The 2016 Reevaluation noted that operations of both the 76 Gas Station and the Market would be damaged and therefore "the entire larger parcel will be acquired." (*Id.* at 178–179); (*see also id.* at 212) ("The property occupied by the existing Montlake 76 Service Station and Montlake Market to the west of 22nd Ave NE and Montlake Boulevard would be acquired . . . WSDOT may also use the property for construction staging, traffic shifts, and transit access during construction.").

Because the 2016 Reevaluation considered the noise impacts of using the Market's property for construction staging, Plaintiffs are time-barred from arguing that Defendants failed

to adequately consider such impacts in the 2018 Reevaluation. *See* 23 U.S.C. § 139(l).[6]

Similarly, Plaintiffs are time-barred from arguing that use of the Market property as a construction staging area would lead to a loss of the 500-foot buffer initially contemplated by the FEIS. (*See* Dkt. No. 53 at 12.) The design changes raised in the 2016 Reevaluation would have allowed Plaintiffs to lodge that challenge, but they failed to do so within the statute of limitations. (*See* Dkt. No. 33-13 at 205–09.) To be sure, the Project's expanded limits of construction have not changed since the 2016 Reevaluation, such that Plaintiffs could raise this challenge for the first time. (*See id.* at 56–58, 220.)

Plaintiffs raise other noise source challenges that are time-barred. For example, Plaintiffs argue that noise associated with the reconstruction of Montlake Boulevard will result in noise impacts not adequately considered in the 2018 Reevaluation. (Dkt. No. 53 at 10.) But the FEIS anticipated the need to reconstruct and shift traffic on Montlake Boulevard as part of ongoing Project construction. (*See* Dkt. No. 43-2 at 47, 59, 60, 78, 81.) Further, the 2016 Reevaluation specifically discussed design changes that would require the reconstruction of Montlake Boulevard. (*See id.* at 178) (noting that preferred alternative would require "raising the reconstructed Montlake Boulevard and ramps between Montlake Boulevard and SR 520 eastbound."). Because the FEIS and 2016 Reevaluation considered these issues, Plaintiffs cannot argue that they will result in new environmental impacts not previously considered. *See* 23 U.S.C. § 139(l).

As for the other construction-related noise sources cited by Plaintiffs—noise generated from water-line and sewer relocation, increased haul trucks, and the cumulative effect of such

---

[6] To the extent Plaintiffs argue that the 2018 Reevaluation failed to consider the noise arising from an expanded construction zone generally, the construction zone has not expanded beyond what was considered in the 2016 Reevaluation, regardless of whether Defendants use the exact location where the Market now stands. (*See* Dkt. No. 33-13 at 56–58, 220) (maps clearly indicating the Market property falling within the new limits of construction outlined in August and November 2016). In other words, the 2016 Reevaluation anticipated that the construction staging area would expand to where the Market is located.

noises—Defendants considered such impacts in the FEIS. For example, the FEIS noted that "[c]onstruction-related traffic, light and glare, noise, and dust would affect residents living within approximately one to two blocks of the construction zone. In addition, residents living across the street or adjacent to potential construction staging areas would also be affected, primarily from an increase in truck traffic." (Dkt. No. 34-4 at 78.) The FEIS specifically discussed the noise that would be generated from haul trucks during construction activities—an impact that Plaintiffs now assert that Defendants failed to adequately consider in the 2018 Reevaluation. (*Compare* Dkt. No. 34-4 at 133, *with* Dkt. No. 53 at 14.) The FEIS also anticipated that the construction zone would need to be expanded as the Project unfolded and design refinements arose. (*See* Dkt. No. 33-15 at 152.) The 2016 Revaluation noted that the noise and vibration impacts described and considered in the FEIS would not change. (*See* Dkt. No. 33-13 at 190.)

While Plaintiffs argue that these construction-related activities will result in increased amounts of noise not initially considered, that does not mean the actual environmental impact at issue—noise from various construction activities—is substantially different from the impacts Defendants considered in the FEIS and 2016 Reevaluation. *See N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008) (SEIS only required where project changes "may result in significant environmental impacts 'in a manner not previously evaluated and considered.'"). The Court finds that Defendants' determination that the closure and demolition of the Market would not result in significant noise impacts different from those previously considered in the FEIS and 2016 Reevaluation was not arbitrary and capricious. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1157.

### b. Loss of Noise Barrier

Plaintiffs assert that demolition of the Market will result in "the loss of a noise barrier," which is "an impact not considered in any of the agencies' NEPA analysis, including the

reevaluations."[7] (Dkt. No. 53 at 15.) Plaintiffs assert that the Market acts as a noise barrier for the surrounding neighborhood, and that homes close to the Market "would experience an additional 6 dB of construction noise if the structure were removed and the staging area expanded to include the entire Market parcel." (*Id*. at 14.) Plaintiffs assert that the 2018 Reevaluation failed to take a hard look at the increased noise impacts that would result from the loss of the Market as a noise barrier. (*Id*. at 14–15.)

The 2018 Reevaluation specifically discussed the noise and vibration impacts associated with demolition of the Market. (*See* Dkt. No. 33-1 at 71.) The 2018 Reevaluation stated that demolition of the Market "would occur during daytime hours and meet the City of Seattle noise regulations." (*Id*.) It also noted various "noise abatement measures that could be implemented to limit the effects of construction" to include "requiring mufflers, installing temporary or portable acoustic barriers, shutting off idling equipment, and notifying nearby residents and institutions when noisy work would be occurring." (*Id*.) As for the use of the Market property as a construction staging area, the 2018 Reevaluation noted that construction activities "would meet City of Seattle noise regulations or variance requirements granted by the City of Seattle." (*Id*.) To this end, Defendants obtained a "Major Public Project Construction Noise Variance" from the City of Seattle, which set time-of-day limitations on the demolition of the Market and other activities. (*Id*.)

The Court finds that Defendants took a hard look at the noise impacts that would result from demolition of the Market, including the loss of the Market as a noise barrier. Like the FEIS, the 2018 Reevaluation discussed various measures for mitigating construction noise, including the use of "temporary or portable acoustic barriers." (*See* Dkt. No. 33-1 at 71.) Plaintiffs' own expert witness testified that such "construction noise walls" can be very effective noise

---

[7] The Court disagrees with Plaintiffs' characterization of the loss of the Market structure as an environmental "impact." (Dkt. No. 53 at 15.) The relevant environmental impact is not the removal of the building itself, but the increased noise that Plaintiffs argue Defendants failed to account for.

mitigation tools. (*See Section* 106 AR00003654.) Consistent with the FEIS, Defendants also obtained a noise variance for demolition of the Market, which would allow for greater noise than the City's standard limits during nighttime construction.[8] (*See* Section 106 AR00002348–2439.) Considering these measures, as well as the FEIS and 2016 Reevaluation's analysis of construction-related noise, Defendants' determination that the closure and demolition of the Market would not significantly impact construction-related noise in a way not previously considered in the FEIS and 2016 Reevaluation was not arbitrary and capricious. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1157.

### c. Impact on Montlake Historic District

Plaintiffs assert that the increased noise from the demolition of the Market is particularly acute because the properties that will be primarily affected are in the Montlake Historic District. (Dkt. No. 53 at 15.) Plaintiffs state that "when assessing the impact of new noise sources in Montlake," Defendants ignored the impacts that would be caused to the Montlake Historic District. (*Id.*) Plaintiffs assert that the 2018 Reevaluation did not consider "the number of historic homes that will be impacted by new noise sources, the magnitude of the noise increases, of the impact of that noise on the qualities sought to be protected by the historic district designation." (*Id.* at 16.) The 2018 Reevaluation did discuss the impact that closure and demolition of the Market would have on "cultural resources" such as historical buildings; however, that discussion centered on the fact that the Market's building was eligible for listing on the National Register of Historic Places. (Dkt. No. 33-1 at 15.)

The Court is unpersuaded by Plaintiffs' position regarding the impact on historic properties for two primary reasons. First, Plaintiffs essentially repackage their arguments

---

[8] Again, the FEIS specifically contemplated that Defendants would obtain noise variances and employ other mitigation efforts to reduce the impact of construction-related noise. (*See* Dkt. No. 34-3 at 133–34.) To the extent Plaintiffs challenge the adequacy of these mitigation measures, they are effectively challenging a process analyzed in the FEIS, which is time-barred by the applicable six-year statute of limitations. *See* 28 U.S.C. § 2401(a).

regarding Defendants' failure to adequately consider construction-related noise and apply them to the historic properties within the Project's expanded limits of construction. (*See* Dkt. No. 53 at 15–17.) NEPA is concerned with *environmental* impacts, and does not provide special protections to historic properties. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1156 ("NEPA has no independent requirement that an agency examine, separate and apart from any environmental impacts, the impact that a federal action will have on historic properties.").[9] As explained above, the Court rejected Plaintiffs' argument that increased construction noise represents a significant new impact that Defendants had not previously considered or failed to consider in the 2018 Reevaluation. *See supra* Part II.C.1.b. The Court does not find the same noise-related arguments availing simply because they are applied to historic properties.

Second, Defendants already took steps to mitigate the Project's impacts on the Montlake Historic District by entering into a Programmatic Agreement as part of the ROD. (*See* Dkt. No. 3-15 at 211–59.) The Programmatic Agreement acknowledged that the Project would have adverse effects on historic properties. (*Id.* at 213.) Consistent with federal regulations, the Programmatic Agreement was developed to identify measures that could be taken by Defendants to mitigate such adverse effects. (*Id.*); *see* 36 C.F.R. § 800.6. The Programmatic Agreement required Defendants to create and implement a Community Construction Management Plan ("CCMP") that outlined numerous measures that WSDOT would follow to mitigate the effects of construction on historic properties. (Dkt. No. 33-15 at 232.) As part of the CCMP, WSDOT was required to allow concurring parties and other affected parties "to have input into construction management practices that can help to avoid, minimize, or mitigate the effects of construction activities on historic properties . . . ." (*Id.* at 232–34.) The CCMP also includes a dispute resolution process, through which concurring parties, such as Plaintiff Montlake Community

---

[9] While the relevant regulations require Defendants to include "discussions" of "historic and cultural resources," the 2018 Reevaluation satisfied that requirement by discussing how the Market was not a protected historic property. *See* 40 C.F.R. § 1502.16(g); (Dkt. No. 33-1 at 15.)

Club, can object to implementation of the CCMP. (*Id.* at 234.)

As mandated by the Programmatic Agreement, the CCMP requires WSDOT to comply with the local noise regulations for construction and equipment operation. (*Id.* at 230.) The CCMP further requires WSDOT to consult with "adjacent property owners to evaluate and install possible sound-buffering mechanisms between adjacent historic properties and Project construction staging areas." (*Id.*) Such measures were undertaken with the express purpose of mitigating the impact of construction noise on historic properties. (*Id.* at 229–30.) In evaluating the impacts that design changes in the Montlake Interchange Area would have on cultural resources, the 2016 Reevaluation noted that:

> The proposed design refinements have in part been arrived at through consultation regarding commitments contained in the Programmatic Agreement. WSDOT identified the need to make minor adjustments to the limits of construction to facilitate construction. None of the proposed updates were located outside of the previously identified Area of Potential Effects. WSDOT, on behalf of FHWA, evaluated the proposed changes to the limits of construction and determined that they would not adversely affect historic properties.

(Dkt. No. 33-13 at 189.) This conclusion specifically took into consideration the following design change: "Expansion for the acquisition of the property in which the Montlake Market and Montlake 76 Service Station is located." (*Id.*)

Plaintiffs largely ignore the Programmatic Agreement and the effect that document had on mitigating the environmental impacts of the Project on the Historic Montlake District. But such mitigation measures are relevant to determining whether Defendants took a hard look at the potential environmental impacts that were the focus of mitigation. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1156 n.5 ("In determining whether the potential construction effects would likely be significant, the Agencies are permitted to take into account mitigation measures which reduce the impact of construction."). Given the consideration that the Programmatic Agreement and 2016 Reevaluation gave to the impact of construction-related noise on historic properties, Defendants' determination that the closure and demolition of the Market would not significantly

impact historic properties in a way not previously considered in the FEIS and 2016 Reevaluation was not arbitrary and capricious. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1157.

2. <u>Traffic Impacts</u>

Plaintiffs assert that the 2018 Reevaluation failed to consider the traffic impacts that would be caused by the Market's closure. (Dkt. No. 53-1 at 20.) Plaintiffs argue that Defendants' "analysis of the traffic impacts is flawed because it is incomplete." (*Id.*) While acknowledging that Defendants' considered "how traffic volumes on the Montlake corridor would change with the closure of the Montlake Market," Plaintiffs argue that the 2018 Reevaluation should have assessed "the impacts to Montlake residents." (*Id.* at 20–21.) Plaintiffs appear to argue that Defendants should have determined the exact number of Montlake residents that regularly used the Market and thus would "be forced onto Seattle's overcrowded arterials to make their way several miles to the next closest grocery store, a trip that may take almost 20 minutes." (*Id.* at 20.)

In the 2018 Reevaluation, Defendants concluded that "the closure and demolition of the [] Market is not anticipated to adversely impact nearby traffic levels so the impacts described in . . . the [FEIS] would not change." (Dkt. No. 33-1 at 14.) In reaching this conclusion, Defendants relied on an analysis prepared by a third-party consultant that detailed "how travel patterns would change with the closure of the Montlake Market and 76 Gas Station." (*Id.* at 20–58.) First, the analysis collected "vehicle, pedestrian, and bicycle counts" to quantify the existing level of traffic using the Montlake Market and 76 Gas Station. (*Id.* at 26.) The counts were made during peak evening traffic hours over the course of several days in February 2018. (*Id.* at 28.) Then the analysis applied an established vehicle trip methodology[10] to determine how existing traffic

---

[10] The methodology was drawn from the Institute of Transportation Engineers Trip Generation Manual, 9th Edition, which is identified in the report as an industry standard. (Dkt. No. 33-1 at 26.) The methodology is based on national survey data for sites similar to the Market and 76 Gas Station. (*Id.* at 27) (using the land use codes "Supermarket" for the Market, and "Gasoline/Service Station with Convenience Market" for the 76 Gas Station). The methodology

flows in the area would change once the Market and 76 Gas Station were closed. (*Id*. 26–34.)

After applying this methodology to the observed traffic counts, the analysis concluded that "closure of the Market and Gas Station would result in 63 fewer vehicle trips accessing the Montlake corridor in the PM peak hour." (*Id*. at 31.) Even applying a more conservative approach, which assumed all existing bicycle and pedestrian trips would be converted to single occupancy vehicle trips, the analysis concluded that closure of the Market and 76 Gas Station would result in five fewer vehicle trips on the Montlake corridor during the PM peak hour. (*Id*. at 31.) This conclusion was largely a result of a reduction in "primary" and "diverted" vehicle trips that would result from the Market and 76 Gas Station being closed. (*Id*. at 31–32.)

Plaintiffs' objections to the traffic analysis are unavailing. First, Plaintiffs question the methodology used to quantify vehicle trips to the Market because it did not determine the "origins of the Market's customers." (Dkt. No. 53 at 20.) As a result, Plaintiffs assert that to the extent the methodology considered the number of Montlake residents who would be impacted by the closure, "that information was unsubstantiated and likely understated." (*Id*. at 21.) Plaintiffs' critique ignores that that Defendants' traffic analysis specifically accounted for pedestrian and bicycle trips—trips that Defendants could reasonably assume are primarily made by members of the surrounding Montlake neighborhood.[11] Even assuming that those pedestrian and bicycle trips were converted to vehicle trips going to another grocery store, the traffic analysis still estimated a slight decrease in overall peak traffic. (Dkt. No. 33-1 at 31.)

Second, in suggesting that the Market's closure would necessarily lead to increased

_____

classifies the traffic accessing a particular location into three categories of "vehicle trips": "primary, pass-by, and diverted." (*Id*. at 26.)

[11] Indeed, the decision to count pedestrian and bicycle trips was in response to community concerns that "local foot and bicycle traffic that currently utilizes the market will be converted into vehicle traffic, which would lead to increased traffic and a potential reduction in service on local roadways." (Dkt. No. 33-1 at 13.) Pedestrians and bicyclists would seem to be representative of the very population that Plaintiffs assert Defendants failed to account for. (*See* Dkt. No. 53 at 21.)

traffic among residents of the Montlake neighborhood having to travel to more distant grocery stores, Plaintiff largely brushes aside the fact that there is another market in the neighborhood, approximately a quarter of a mile from the Market. (*Id.* at 31; Dkt. No. 53 at 21) ("Mont's Market is not a comparable market—it is smaller than the Montlake Market and unlike the Montlake Market, it is about 50% devoted to beer and wine sales and has limited fresh produce."). Defendants' traffic analysis acknowledges this other neighborhood market, and it would have been reasonable for Defendants to conclude that the existence of this alternative market would lessen the amount of traffic being diverted to more distant grocery stores and thus reduce the impact on Montlake residents losing a neighborhood grocery store.

Finally, although Plaintiffs criticize different aspects of the methodology used in the traffic analysis, they do not point to another methodology that Defendants should have relied on. As previously mentioned, the traffic analysis relied on an industry-standard methodology. (*See* Dkt. No. 33-1 at 26–28.) Defendants were entitled to rely on the conclusions provided by their experts, so long as those opinions were reasonable. *See Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1359 (9th Cir. 1994) ("an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if . . . a court might find contrary views more persuasive."). The record firmly supports that the traffic analysis' conclusions were reasonable, and that Defendants therefore conducted a "reasoned analysis" of the relevant traffic impacts associated with the closure and demolition of the Market. *Id.*

For those reasons, the Court concludes that Defendants met their obligation to take a hard look at the significance of any traffic impacts that would result from the closure and demolition of the Market. Defendants' determination that closure and demolition of the Market would not significantly impact traffic in a way not previously considered was not arbitrary and capricious.

In consideration of the entire record, the Court concludes that Defendants satisfied NEPA's requirement to take a hard look at the environmental impacts associated with closing and demolishing the Market as outlined in the 2018 Reevaluation. Defendants' determination

that the closure and demolition of the Market would not lead to significant environmental impacts not previously considered in the FEIS and 2016 Reevaluation was not arbitrary and capricious. Therefore, Defendants' decision to forego an SEIS in response to this design change was not arbitrary and capricious. Plaintiffs' motion for summary judgment (Dkt. No. 53) on this claim is DENIED and Defendants' cross-motions for summary judgment (Dkt. Nos. 48, 52) is GRANTED.

### D. NEPA Claim – Revised Record of Decision

Plaintiffs argue that the Court should require Defendants to issue a new ROD because the closure and demolition of the Market represents a substantial change to the Project not reflected in the ROD. (Dkt. No. 55 at 20; *see also* Dkt. No. 53) ("Because the project changes in Montlake result in probable significant impacts and because they were not analyzed in the 2011 EIS, a new ROD should have been prepared, explaining FHWA's rationale for making these changes."). Given that the Court has concluded that Defendants' decision to not conduct an SEIS to assess the environmental impacts associated with the closure and demolition of the Market was not arbitrary and capricious, the Court similarly concludes that Defendants' decision to not issue a new ROD was not arbitrary and capricious. Plaintiffs acknowledge that if the Court determines that an SEIS is not needed "there is no need for an amendment to the ROD." (Dkt. No. 57 at 8.) Therefore, Plaintiffs' motion for summary judgment (Dkt. No. 53) on this claim is DENIED and Defendants' cross-motions for summary judgment (Dkt. Nos. 48, 52) on this claim are GRANTED.

### E. NHPA Claim

In their amended supplemental complaint, Plaintiffs allege that Defendants violated NHPA because the 2018 Reevaluation failed to adequately consider, evaluate, or provide for mitigation of the noise and other impacts associated with the closure and demolition of the Market that would specifically affect the Montlake Historic District. (Dkt. No. 43 at 25.) In their response to Defendants' cross-motions for summary judgment, Plaintiffs state that they "have

decided not to pursue their NHPA claims. Summary judgment may be entered dismissing those claims from this case." (Dkt. No. 57 at 8.) Given Plaintiffs' concession, and having independently reviewed the merits of Plaintiffs' NHPA claim, the Court FINDS that Defendants are entitled to judgment as a matter of law. Therefore, the Court GRANTS summary judgment on this claim in favor of Defendants.

## III. CONCLUSION

In accordance with the Court's order:

1.      Plaintiffs' motion for summary judgment (Dkt. No. 53) is DENIED;

2.      Plaintiffs' motion for voluntary dismissal (Dkt. No. 64) is GRANTED and Plaintiffs Montlake LLC and Stelter Montlake LLC's claims are DISMISSED with prejudice and shall bear their own costs and attorney fees. Further, the Court ADOPTS the other terms of the parties' stipulation (Dkt. No. 70) regarding the dismissal of Plaintiffs Montlake, LLC and Stelter Montlake, LLC, to the extent those terms are relevant to the resolution of this action;

3.      Defendants' cross-motions for summary judgment (Dkt. Nos. 46, 52) are GRANTED; and

4.      Plaintiffs' claims are DISMISSED with prejudice.

DATED this 20th day of August 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE